Call the third case of the morning, number 18-30659, BP Exploration v. Claimant ID 100139132. My personal campaign is from now on to identify claimants because I can't do five-digit numbers. And in this case, the claimant is the well-known law firm Phelps Dunbar. I know. You know it, and I know it, and now the world knows it. Okay, we'll hear from Ms. Rosenberg, I think. No. No, I'm sorry. You're right. Ms. Rosenberg. Good morning and may it please the Court. Elizabeth Rose for the Appellant BP. This appeal of a $9.4 million CSSP award to a corporate law firm raises a number of important issues, and I would like to start with the one that is the most significant and easily warrants remand. Specifically, this Court should reverse and remand because the New Orleans Appeal Panel failed to conduct a de novo review to ensure that out-of-zone losses were not included in Phelps Dunbar's award as required under the settlement agreement and instead merely relied on Phelps Dunbar's own characterization of its London office. By merely adopting Phelps Dunbar's implausible assertion It sounds like, do you have any idea how much, you know it, it's a big claim, $9 million was paid out roughly. How much would this issue impact that? Do you know? We can't tell because we don't have the information to make that determination. BP, the nature of the settlement agreement is the BP doesn't really know any of the underlying facts until the appeals panel rules, right? That's correct. All it can do is ask the appeals panel to investigate things. That's right. So the profit and loss statements you have don't show, they don't break out London. That's correct. Do you agree, though, there is a, when you go to the appeals panel, it's a baseball process, which means that you take one or the other number. The appeal panel can't come up with a middle ground like a lot of arbitrators actually like to do. They can also remand. Do you agree that in that type of baseball appeal process, where you've got a zero and a $9 million, that the panel should only remand if it's a material difference with those numbers? In other words, if it's $20,000 off, isn't there some ability for the panel to say, as I think they did on the New Orleans claim with the copying expenses, they said, we don't really have to decide this because it's not, it's such a small fraction. It wouldn't change us, our decision between zero and $9 million. I think that reference to material that the appeal panel used is actually a red herring. What happened was the appeal panel just didn't decide the issue as to the recurring. That's the way I read it, too. And why don't they have that discretion if it only makes $10,000 difference and they have to choose between zero and $9 million, why shouldn't there be a materiality requirement? I think when you look at the settlement agreement as a whole, and you look at provisions like 6.1 and 6.4 that require appeal panels to assure adherence to the terms of the settlement agreement and to enforce compliance with the settlement agreement through a de novo review, it simply can't be the case that if there's a legal error or an unresolved potential misapplication of the settlement agreement, that the baseball process simply allows the appeal panel to pick a number. Well, no. It let us to pick one of the two numbers. I mean, the baseball process, right. But the baseball, if they have to remand every time the two numbers aren't precisely correct, we're going to be here another decade, it seems to me. But that's — but isn't that where they're supposed to explain why something is not material so that they're — otherwise the possibility of judicial review is nonexistent? That's right. Certainly explaining here would have given us more to work with to understand what the appeal panel meant by saying it's not material. But we think — But the dollar amount was so small that it wouldn't have favored them going for the zero award BP proposed. The appeal panel didn't make that determination, though. And, in fact, we're talking about hundreds of thousands of dollars of recurring fees here. So, again, while — if you look at the settlement agreement as a whole, you look at the very purpose of the appeal panel to assure that there's been adherence to the terms of the settlement agreement — Does Sullivan & Cromwell have an office in London? The firm does. Do you have any idea how much it costs to maintain just the office premises? Personally, I do not, but I imagine it's quite expensive. Yes. Right. And, therefore, in order to justify an expensive investment like that, London being one of the most expensive property markets in the entire world, you've got to generate fees. That's right. And here, where you see the appeal panel merely accepting at face value Felt's Dunbar's assertion that there are no revenues, that's not consistent with the appeal panel's obligation to conduct a de novo review to look at the complete record. And, in particular, while BP isn't involved in the settlement program, the back and forth, and doesn't come into the appeal, BP did put in what evidence it could from Felt's Dunbar's own website, and the appeal panel makes no mention of that. In particular, on the website, the firm states that the London office has been around since 1987, that it's a great asset to the firm, and, in particular, states that attorneys use that office when working with clients, and when performing, rather, providing legal services. And that matches up precisely with the definition of a facility under Exhibit 5 and Policy 467 in the settlement agreement. And, so, not only is this an incredibly important issue here in this case, given the centrality of the limitation of economic damages as loss arising in the Gulf Coast area, but it's also an important issue because we've seen appeal panels coming out different ways in terms of what's required of them to assure that out-of-zone losses are not included in a claimant's award. There was just a decision issued yesterday on what's a facility in or out of the zone.  I have not seen that decision. Okay. What's the split in the panels? On what's an outside facility? That's the question? The split is in terms of what's required of appeal panels and of the CSSP to assure that out-of-zone losses are not included. So, for example, we cite in our brief one appeal panel decision, number 2016-1173, where it's fairly similar to what happened here in that you had a claimant who represented that they had a sole office, and that sole office, they said, was in Destin, Florida. There wasn't any further analysis of that at the program level. At the appeal, BP came in and said, wait a second, here's the website. The website refers to satellite offices. And so in that appeal, the appeal panel said that it would be in derogation of the panel's charge to conduct an over-review of the full record were it to affirm the CSSP's findings on this important issue based on the paucity of supporting data and analysis in the record. So in that appeal, the appeal panel remanded so that the settlement program could engage with the claimant, get more information, and make a determination as to whether those referenced satellite offices qualified as a facility. It depends on, obviously, on the facts of each case and what goes on in the alleged satellite offices, right? Yes. Of course it does. Well, as you step on the discretion and these evaluations that are being made, what you're increasingly doing, it seems to me, is to take a settlement, a very large settlement, which presumably took this away from the courts themselves and turning it right back into another litigating posture back into the courts themselves. In other words, when you start differentiating cases, we've got to react to those. You don't give enough latitude for differing outcomes reflecting the underlying factual patterns. Then you have changed, really, the nature and character of the review that's contemplated by this settlement. It strikes me. Well, here I think it was an abusive discretion for the district court not to review for two independent reasons. One, because on the — They review, but by what metric? I beg your pardon? They review, but by what metric? What's the standard by which the district court reviews? This court has said in a number of decisions that it's an abusive discretion in two circumstances. If the district court doesn't review when there's either a clear misapplication of the settlement agreement or the potential for misapplication of the settlement agreement. And the second situation is if there's been a recurring issue that has divided appeal panels and the decision would assist with the administration of the agreement. You're taking the position here that there was a legal error by the appeals panel, correct? Yes. Now, what the appeals panel says is BP's final argument is that the settlement program improperly included financials attributable to the office in London. Appellant, i.e., BP, can point to no revenue associated with this office. Phelps maintains that the firm uses the location strictly for marketing when no lawyer is housed at the office and no revenue generated from the site. Without any evidence, the revenues were generated from the London office, blah, blah, blah. But again, BP has no access to that financial information, does it? It does not. And that's, I mean, I will say that seems to be a recurring refrain in some of these appeals by BP, that the appeals panel, and maybe it's because the baseball program is inherently strange, but the appeals panel apparently quite often says, well, the claimant says this, that's okay, BP loses. Right. And we think that's inconsistent with the settlement agreement, which says that appeal panels need to conduct a de novo. What was BP's reason for claiming that zero was the appropriate amount? In BP's initial and final proposal, BP explained that because of these issues, because of the The only issues were the Tupelo office, which, unless I'm mistaken, couldn't have been too large, unless there's a lot in Elvis's historical monuments there, or the copying charges, which were $150,000 or so, or the London office. So how could BP, I mean, whatever BP was doing may have been speculation, but why zero? The reason BP put in zero was because BP took the position that remand was the appropriate recourse, specifically that the record did not support the award of the CSSP, and that an appropriate award couldn't be calculated short of remand. I see. So in addition, just to touch on the recurring revenue, or rather the recurring fees, we because the New Orleans appeal panel failed to apply, it didn't make any decision, actually, failed to apply its independent judgment to look at the substance of these fees and make a determination as to whether they constituted revenue. And if they constituted revenue, then the settlement agreement in policy 373 requires that they be included in the calculation of the claimant's award. Doesn't the BP website also say that Phelps engages in arbitration in London, or allude to something like that? I think there are a number of indications on Phelps Dunbar's website of work that they do in London with the insurance market in London and European insurance market, but with that particular reference, I'm not positive. On the photocopying and printer expenses, what language clearly says this is revenue? There isn't language in the settlement agreement that says this is revenue. That's where the appeal panel or the CSSP needed to make a determination. But if you look at a common understanding of what revenue means, it's income from the sale of goods or services, and that's not disputed, that these fees were received as a result of Phelps Dunbar providing services to clients, services such as photocopying and scanning and printing and other litigation support, that they negotiated these fees in advance, that they, in fact, received a profit. Were the expenses associated with them included? I mean, did that bring down the overall income numbers? Or was it all just excluded? Because I think their argument is, look, we make these deals with clients, sometimes we have to run. Right. And with respect to these four specific accounts that BP believes should have been, were revenue and should have been included, there was, at least for the photocopying, a separate expense account, and that you can see that there was revenue, that there was profit, rather, on these fees. They had to pay income tax, right? I beg your pardon? I say, Phelps would have had to pay income tax on this amount of money taken in. That's right. And then whatever costs were expended would have been netted out as business expenses. But BP wasn't saying that the entire gross return from this had to be calculated, right? Right. The only thing that BP has argued, or what we're arguing, is that these separate, these four separate accounts that reflected the income received from providing these services, that the substantive nature of those was revenue, and it should have been, the CSSP should have reached that determination and did not, didn't reach it at all. Okay. Thank you. You have time for rebuttal. Mr. Rosenberg. Good morning, Your Honor. How many claims did Phelps Dunbar file against this settlement program? Your Honor, we filed two before the court now, and there were two others that were filed. Why? There were different offices, different facilities. These were two separate claims, and they were consolidated before this court. And what are the other two facilities? One was Mobile, and I believe the other one was Tampa, Gulfport. I'm sorry, Your Honor. Gulfport. Gulfport or Mobile are two separate facilities? That's correct, Your Honor. Two separate offices, two standalone. And basically, are you claiming that Phelps Dunbar lost money because of the BP oil spill? Absolutely. Didn't represent a single person connected with the BP oil spill? No, Your Honor. That's a different question, Judge Jones. We have represented a couple of people, not a lot of people. We represented several claimants, as even the appeals panel noted, but that's not relevant. This court has concluded that's not relevant. I'm just saying that Phelps Dunbar, I mean, frankly, it is, it's tacky. That's all I have to say. Well, I don't know what Your Honor is implying, but other law firms— To try to grandstand and make money off of this oil spill when the firm's revenue increased, the firm is representing clients in connection with the oil spill. It just seems to me like a tacky case of trying to, you know, get some free money. Your Honor, Judge Jones, if I could address both of those comments. Sure. Our gross revenue did not increase, despite what BP argues. The gross revenue increased because of an acquisition of another law firm adding 30 different timekeepers in the year 2010. With respect to whether it's tacky or not, we— And I respect your—I'm sorry, Judge Higginbotham. What law firm in Mobile did you acquire? We acquired the Lyons— Lyons? Yeah, the Lyons firm in Mobile. And, Judge Jones, just to go back to your comment, I mean, this Court has approved, as Your Honor knows, other law firms' applications for reimbursement and compensation because of their losses, not because they're trying to grandstand, not because they're trying to add icing to a cupcake, but because they've had actual losses that have been documented by a small army of CPAs from Price Waterhouse that have been reviewed by the— No, no, they have, quote, losses because this is one of the worst deals in history from the standpoint of the compensation scheme. But that's neither here nor there, and I don't mean to distract you. I'm just talking about the professional reputation of one of the great firms, truly great firms, of New Orleans and the United States. And, Your Honor, I respect that compliment, and I welcome it. And that's just my personal— I do share that observation with you, Judge Jones. Yes, sir. But, for example, just within the past 30 days, as Your Honors know, this court has approved the same type of claim for Colton Fields, a well-known law firm in Tampa. We can't—I mean, we can't—there are so many of these now, we can't keep up with them all. I understand. But let's get— Can I address the legal arguments, Judge Jones? Yes, sir. So I don't have to defend my partner and myself? Right. Simply, BP has not identified any legal issues. Let me explain to you my theory about this. And I know exactly—I'm not sure—you know, I have no idea how this is going to come out, but just my problem with the argument is, as I understand the settlement program, the accountants take the first cut, and they have certain responsibilities to oversee what the claim is according to the terms of the settlement agreement and so on. And then if BP objects, BP files an objection, and then the appeals panel—and they have to state reasons why, and the appeals panel has to look into those reasons and document them. But BP does not have access to the underlying financial data. Right? Judge Jones, you were reading my notes. That was what I wanted to address. That is incorrect. Okay. The financial data, which included our tax returns, our audited financial statements, both monthly and yearly, our gross revenues, those were all available, the tax returns, Judge Jones. That kind of debt financial data was available to BP on the claims administrator's portal. They even cited to those financials, and in fact, Judge Jones, specifically, to address your comment, when we were before the appeals panel, BP first in their initial proposal made a suggestion of an adjustment of $75,000 downward from the award. They went to the final proposal, and they sat on their hands figuratively and made a zero award, suggested a zero award to the appeals panel. And then when the appeals panel ruled, and as I know the members of this Court and the panel have looked at it, the appeals panel wrote a fairly detailed ruling. Then BP goes to Judge Barbier and asks him for – How many – well – Judge – I'm sorry, Judge Jones. If you just let me spit it out, I promise I'll be quick. And then when they go to Judge Barbier and they ask him for his discretionary review, they say, well, it would reduce it by a couple of hundred thousand dollars. So they know the financials. They're not in the dark. I mean, they've got armies of accountants and lawyers. They know exactly what the financial numbers are. They've looked at those financial numbers. And, frankly, the two issues they've raised, one is the photocopying, as Judge Costom alluded a moment ago, and the other one is the London office. The photocopying is basically one-twelfth to one-twenty-seventh of the total amount of the award, and the London office had no revenue. That's not just me saying that, Your Honors. That comes from the claims administrator. That comes from the accountants. Well, the definition – And the appeals panels that were unanimous. All right, but the definition of facility is not necessarily in accord with tax law on where you identify revenue. I've sat on two facility cases, and in one of them you had salesmen who just worked remotely where the manufacturing plant was in New Orleans, and everybody could understand why those were not facilities under the definition. But a law firm is not going to pay for extraordinarily – I'll bet the law firm pays a million dollars a year for its rent and upkeep at its London office, just because London is extraordinarily expensive. And the firm says, we have a lawyer working out of London all the time. Now, the firm is not going to have lawyers sitting in high-priced real estate in London if they are not billing hours. Judge Jones, I know what the website says, and I realize there's a little bit of embellishment on everybody's website, but I can represent to the members of this panel that Phelps Dunbar does not have a lawyer assigned to its London office. It does not have a lawyer there monthly. It does not have a lawyer licensed in London. It has a London office, as we've represented and as the panels, both panels unanimously agreed, that it is for marketing purposes. And that's what the claims administrator said. BP has not proved otherwise. All BP has done, as the appeals panel said, is speculate about what the London office was for. Well, here's my theory, because my theory would be that the thing should be remanded to the accountants, and the accountants would get Phelps Dunbar to produce time records from lawyers who were in the London office. Judge Jones, can I just say this? Mm-hmm. The accountants, the ones you're talking about, looked at this not once, but twice. Twice they confirmed the appropriateness of the award. The accountants made several— Did they do what I suggest? I'm sorry, Your Honor? Did they do what I suggest? Your Honor, they had all of those records. They had everything that was available, that they wanted, we gave to them. They made seven different inquiries to Phelps for information. Price Waterhouse is not a fly-by-night outfit, as Your Honors know. I mean, they were very thorough and scrutinized our records. And you know I was on the panel that's reversed Price Waterhouse or one of those accountants at least twice for either accepting blindly the representations about what was fixed versus variable costs. Your Honor, the— Contrary to basic accounting principles, in my theory of the—as I understand the facility definition, it says that where you generate revenue outside of the zone covered by the BP oil spill, that is not to be included for purposes of getting an award. Now, if it's only $200,000, I mean, that's, you know, it's something. It's not a lot, but— Well, Your Honor, that goes back to— Just for the sake of accuracy and integrity of the program. Didn't mean to interrupt, Your Honor. That's okay. That goes back to a point Judge Costa made, which is the baseball policy. That's a policy that BP negotiated, BP submitted to this court and to the district court and it got approval and then it signed off on. The baseball policy, as Judge Costa recognized and as I know the other members of this panel know, says you—the panels look at the position of BP and the position of the claimant and they take the one that's closest to being accurate. That's what the appeals panel did. BP is at zero, zero, even though they acknowledged just months later to Judge Barbier there was some validity to the award. It's just they disagreed as to the accuracy of the amount awarded, period. But the fact is, both appeal panels, for Tupelo and New Orleans, not only said the award that Phelps proposed was closest to being accurate, it said it was the correct result. Both of them said that. Now, Your Honors, under the framework of the settlement agreement, there needs to be some legal error. I mean, there can't just be questions about facts and second-guessing the facts of the appeals panel and the claims administrator because that's not an abuse of discretion. And that's what Judge Higginbotham asked a moment ago. I understand all those arguments, but let me go back to what I suggested because you have not responded to what I suggested. You say the BP had all the evidence in front of it. Did BP have access to evidence that would have shown that lawyers in the London office were billing hours because I don't see how you can stand there and tell me that rather than have cocktail parties at clearages, you didn't go and you chose to have a full-time facility there. And then you must have somebody there doing something because your website says so, and BP had every right to take that at face value. And those lawyers who are there must be billing hours in some way, some form or fashion. Therefore, it is a facility generating revenue. How could BP access that information even if it was only $1,000? All I had to do was look at the portal, Judge Jones. Just look at the documents. Cite me the record, but you never cited the record. All you said is you have to rely on the accountants. You have to rely on the appeal panel. Where is it in there? And I agree. I'm not saying BP was accurate here. Judge Jones, there was 26,000 pages presented to the claims administrator in terms of documents and then again to both appeals panels. The New Orleans appeals panel concluded that all BP could do was speculate. They didn't want to do anything. Just like with regard to photocopying, they, if you allow me, Judge Jones, they said all they said was BP, they referred to the fact that the panel said BP has a culpable argument. How do you prove it's not a facility, Mr. Rosenberg? Where are your record cites to show that it is not a facility? It is not a facility because there is no revenue stream. And under Policy 467, which BP accepted, it's not a facility. That's where I can't — that's where I — Your Honor, then you would have to negate 467, which — There is no law firm in the world that has an office outside of its home office that doesn't demand an income stream calculable to that office. There is, unless Phelps Dunbar is the richest or the most unusual law firm that exists, and that's all I'm saying, common sense. Your Honor, I understand that. I can assure the panel we're not the richest law firm in the United States. We're not even close. But we're working hard. But I'm saying to Your Honors that the fact is we do not have people working at the London office full time. I mean, they — it's period. That is what the appeals panel concluded. And what this Court is going to do, if Your Honor's suggestion is followed through and accepted by members of the panel, is to basically rewrite the framework of the settlement agreement, rewrite the framework of the baseball policy, and rewrite the discretion given to a district judge, because the standard, as Judge Higginbotham asked, is abuse of discretion. It's fact-based. It's not a legal error. Well, again — This is — this is strictly factually pregnant situation. Where does the facility definition say that you don't have to — you just said something that went way out on a limb as far — the facility — I'm saying if there's no revenue, Your Honor. What I said — I hope it's a sturdy limb, but I said if there's no revenue under policy 467. And that policy 467 is part and parcel of what BP agreed to. And what they're asking you to do now is to rewrite that policy, rewrite the baseball policy — I have nothing — — and change the structure. I have nothing to say about the baseball policy. I'm talking only about the definition of a facility. And that is in policy 467. Right. And that's what is included if there is — the revenue stream cannot be determined to a specific location, which is what occurred according to the factual determinations by the appeal panel. Then you go to 467, and it's not considered a separate facility. And what I am saying is that in law firms, unlike manufacturing companies located in New Orleans, for instance, every lawyer is a profit center. And that's the way law firms treat every lawyer now. So when the lawyer goes to London, the lawyer is the profit center who has to — Your Honor, that lawyer can bill time and create profits by charging at the New Orleans office, which is what happened, even though that attorney might be in London trying to develop business. I mean, that is the factual situation. It might be. while he's in London, I am saying that is part of the facility cost of the London office. I understand what you've said, Judge Jones. Facility revenue. I understand exactly what you've said, but that is not what the record shows. That's not what 26,000 pages show. That's not what the appeals panel concluded. That's not what the accountants concluded. That's because they were misdefining facility. Well, Your Honors, I don't — with all due respect, I don't believe there was any misdefinition of facility, and there's not been an argument to that effect, even by BP before this Court. I mean, the fact is, all BP does is call the claim by Phelps to be suspicious. And there's no proof of that. There's absolutely nothing other than name-calling. As Judge Higginbotham knows, having been a member of two different panels just last month, that was rejected when Judge Elrod wrote the cases on March 26th and March 28th that Judge Higginbotham sat on the panel. I mean, it was easy — Well, you know, part of the problem with this whole settlement, and I'm just going to array it here and give you about 30 seconds to make up, but part of the problem — and you have represented other claimants, but a big part of the problem with this settlement is that the architecture of the settlement, going from the baseball to the accountant to the settlement to Judge Barbier's discretion, which he hardly ever exercises to us, is that we have less basis for achieving stare decisis in this whole program than we have in any other area of the law as far as that — because the whole thing was jury-rigged and, you know. Well, Judge Jones, if I could just use my 30 seconds to hopefully respond to that quickly. No, you don't have to respond. That was my speech. You can say whatever you want in 30 seconds. Well, I am going to say this, and it's in response to your speech, which is that BP negotiated the settlement agreement. BP negotiated these policies. BP negotiated this baseball policy. This was all part and parcel of the framework that BP negotiated, approved, and signed off on. So for all of a sudden BP to be able now to change the rules of the road is not cricket, as you would say. And I would suggest to you respectfully and the other members of the panel that we're operating under the framework of the settlement agreement and the policies, and BP doesn't get to change that at the 11th hour or in this particular case. What is determinative is whether there is any abuse of discretion, and there is absolutely no abuse of discretion in this case regarding the correctness of an administrative decision. That's what this Court said in Holmes v. Motors back in 2016. That's what this Court has repeatedly said in its opinions. In fact, I look within the last 30 days. I'll go back for the last four months. At least 12 judges of this Court have rejected the very arguments that BP is making today. Twelve judges. I mean, they've made— I've been 11 before, Mr. Rosenberg. I'm sorry? No, thank you. I think you've had your 30 seconds. Thank you, Judge Jones. Thank you, Judge Costa. Thank you, Judge Higginbotham. I would ask that you affirm the denial of the right to review because there's no abuse of discretion that was shown by BP at all before Judge Barbier and certainly not before this Court. Yes, sir. Thank you. You have a couple minutes for rebuttal, Ms. Rose. To be clear, BP is not asking for the settlement agreement to be rewritten. All that we're asking for is that it be properly applied. And here, where you have an appeal panel having completely missed the issue with respect to whether the London office is an out-of-zone facility whose revenue and expenses should be excluded, that's a legal error that shouldn't be allowed to stay. Well, they say you had more than enough opportunity to look through the records and decipher that. So with respect to the information that BP gets, once the appeal happens, BP has access to what the claimant provided or what the CSSP asked for, but nothing more. And here 26,000 pages is what Mr. Rosenberg says. I'm not sure about that exact number, but what I didn't hear counsel say is a specific site where the CSSP asked for the billing records, asked to see the time of attorneys that was spent in the London office. I have not seen a site for that. I didn't hear counsel provide a site for that. And that's precisely the problem here is that the CSSP didn't probe this issue, just accepted that representation, that implausible representation that there are no revenue or expenses for the London office. And similarly, the appeal panel did the same thing, didn't look into this issue, didn't consider the website that BP had submitted. And because of that, it's not the case that merely because revenue hasn't yet been identified or hasn't been segregated out in the information that's been provided that it can't be done. And here, to your point, Judge Jones, we think it can be done and that there should have been, that this case should be remanded so that the settlement program looks at the revenue and expenses for that out-of-zone facility. Have any other facility issues arisen in regard to law firms? I can think of one in an unpublished decision. From this court? From this court. Well, would you cite it to us after argument, please? I can do that. I believe it's also in the parties, the 28J letters that case was addressed. Well, we have these darn numbers and I don't, you know, when I read claimant ID number, I can't, all right, well, you maybe just scribble it on a piece of paper. I'm sure we'll, I'll catch up with the pending cases. And just to note, in that case, it was distinct because a separate P&L had been provided for each and every office. And here you have an entire office that is unaccounted for. And in addition, setting aside this implausible representation. What is accounted for? It's wrapped into the New Orleans office. That's right. You want it to be broken out. It's not segregated out. You can't tell what the revenue and expenses are for that out-of-zone office, for that out-of-zone facility. But, I mean, it is typical. The accounting records that I've seen are the ones typically that are contemporaneously created, consistent with the claimant's accounting practices. Well, Exhibit 5 actually indicates that, for example, if a multifacility business doesn't keep separate P&Ls, has a consolidated financials, then Exhibit 5 requires the separating out and the breaking out of that information. And that's what should have happened here because you have a separate, you have an out-of-zone facility whose revenue and expenses hasn't been separated out. Just briefly to touch on the point about council indicated that there was no increase in revenue, but then says, well, there was, but it was because we acquired another firm. I just want to point out that with respect to the $11 million increase in revenue in 2010, $8 million of that is attributable to the New Orleans office, which wasn't joined by any attorneys or paralegals of this acquired firm. How many more of these appeals are we going to be hearing? I know there are still cases in the pipeline, cases that are still in the settlement program. So I hate to be the bearer of bad news, but there still are more decisions that are percolating through the settlement program. Well, you sound like the other VP lawyers that I've asked that question of, and they all say, oh, the end is near. We can see the horizon. The end is near. And then we read something about 1,200 or 2,400 or something like that. Last I heard, we were in the hundreds. A couple hundred is my understanding. But if I may just briefly, Your Honor mentioned earlier a case where this court rejected the CSSP's approach of blindly accepting a claimant's representation. We know about that thing. I mean, your red light's on. We know what we wrote. We may not know what the other panels wrote. Thank you, Judge Jones. I know my time is finished. I just wanted to invite the court's attention to make sure the panel has seen the April 16, 2019, Rule 28J letter we submitted because it refers to the very case your Honor asked about. We have a law firm, or maybe it was Judge Costa. I apologize to both of you. But it identifies its caught in the field, frankly, to be blind. So we could use a name if that's acceptable. Okay. That's fine. All right. Sorry to be hard on you, Mr. Rosenberg. Court will be in recess until 9 o'clock tomorrow morning.